MORTHLAND *v.* LINCOLN NATIONAL LIFE INSURANCE COMPANY.

[No. 27,699. Filed June 9, 1942. Rehearing denied January 25, 1943.]

698

*Earl B. Stroup,* of Hammond, for appellant.

*Gavit & Richardson,* of Gary, for appellee.

SWAIM, J.—In 1932 the Northern States Life Insurance Company, hereinafter referred to as the Northern States, was found to be insolvent and one John W. Morthland was appointed receiver therefor. With the approval of the insurance commissioners of the States

of Indiana and Iowa and of the receivership court, the receiver entered into a reinsurance contract with the appellee, Lincoln National Life Insurance Company, hereinafter referred to as the Lincoln.

By the terms of this contract a trustee was to be appointed by the court to act on behalf of all of the policyholders and beneficiaries of policies of the Northern States and the Lincoln was required to render an accounting annually to the trustee, the insurance commissioner and the receivership court, of all transactions pertaining to the assets and business of the Northern States.

The said Morthland was appointed and qualified as such trustee and as such filed exceptions to the 1937 annual report filed by the Lincoln, to which exceptions the Lincoln filed a reply. On a trial of the issues thus made the court found the facts specially and stated its conclusions of law. The court entered judgment approving said annual report and approving a lien increase of 35% as of December 31, 1937, on all Northern States policies in force December 24, 1938.

Appellant's motion for a new trial, asserting as grounds therefor that the decision of the court was not sustained by sufficient evidence and was contrary to law, was overruled and this appeal, prosecuted as a term time appeal from a final judgment, followed.

The appellee contends that the judgment approving the annual report was only an interlocutory order and must be appealed from as such. The judgment approved the annual report filed by the Lincoln for the year 1937 and a 35% increase of the lien established by the reinsurance contract. The increase of the lien resulted in a definite decrease in the value of the outstanding Northern States policies. On many such policies the increase of the lien entirely wiped out

the equity and the policies were then terminated pursuant to the terms of the reinsurance contract. The fact that the amount of the lien might be later changed by a subsequent annual report did not prevent the order, approving the 1937 report and the increase of the lien, from being a final judgment from which an appeal would lie under the provisions of § 2-3201, Burns' 1933, § 471, Baldwin's 1934. The judgment was a final determination between all the parties that the amount of the lien as revealed and established by the 1937 report should govern in all transactions concerning Northern States policies from the effective date fixed by the judgment to the effective date fixed by a subsequent order, if any, approving a change in the amount of the lien to correspond to the then deficiency in Northern States assets. The judgment approving the report constituted a final judgment from which an appeal would lie. *Hamrick, Trustee* v. *Loring et al.* (1897), 147 Ind. 229, 45 N. E. 107; *Ind. Nat. Bk. of Indianapolis* v. *Danner, Rec.* (1930), 204 Ind. 709, 170 N. E. 327.

The appellee also contends that the appellant's motion for a new trial was not properly filed, therefore raises no question, and that since the appeal was not taken within ninety days after the judgment, this court cannot consider the appeal on the merits.

The record includes a certificate of the clerk of the trial court which states that the attorneys for the appellant delivered the motion for a new trial to the clerk with specific instructions as to the record to be made thereon; that pursuant to said instructions the clerk placed his file mark on said motion, made and initialed an entry of the filing thereof in the court's bench docket, and also made an entry of the filing thereof in the vacation order book; but that no entry of said filing was made in the entry docket. The appel-

lee contends that the failure of the clerk to "make a minute of the filing of such motion on the entry docket, showing the date of such filing and fixing his initials thereto," pursuant to the provisions of § 2-2403, Burns' 1933, § 370, Baldwin's 1934, relating to the filing of a motion for a new trial after the adjournment of the term of court at which the decision was rendered, does not constitute a proper filing of the motion.

When a motion for a new trial is filed in the office of the clerk after the court is adjourned, the above statute makes it the duty of the clerk to make a minute of the filing in the entry docket, showing the date of the filing, and also to make a vacation order book entry showing such filing and the date thereof. These steps are for the purpose of furnishing evidence of the filing within the time and of calling the motion to the attention of the court. A failure of the clerk to properly record the evidence of the filing should not be permitted to deprive a party who has filed a timely and proper motion of his right to appeal. A paper is filed with the clerk when it is delivered to him for that purpose. In the instant case the record made was sufficient to furnish evidence of the filing and to call the motion to the attention of the court. The filing was sufficient. *Gfroerer* v. *Gfroerer* (1910), 173 Ind. 424, 90 N. E. 757; *Powers* v. *State* (1882), 87 Ind. 144, 148.

The appellant's brief first presents propositions relating to the action of the trial court in striking out the exceptions and objections to the 1937 report filed by Grace M. Donnell, a policyholder of the Northern States, who filed said exceptions on behalf of herself and all other such policyholders. Grace M. Donnell did not appeal and the appellant has failed to show how he could have been harmed by this action of

the court. One cannot secure the reversal of a judgment because of errors prejudicial to another party who has not appealed. *In re Gilbert et al.* (1924), 195 Ind. 278, 144 N. E. 551.

Appellant tendered for filing supplemental exceptions to the 1937 report by which he attempted to present questions concerning transactions which occurred subsequent to the period covered by the report and to enlarge on the exceptions already filed. The report was for the purpose of showing the condition of the Northern States business as of December 31, 1937, by showing the transactions occurring during that year and the assets and liabilities as of that date. The appellant agreed in writing as to the valuation of the assets as of that date and the report was made on the basis of that agreement. A sale of the assets made subsequent to that date, at a price higher than the agreed value, would be reflected in the next annual report but could not be pleaded and shown to change the agreed value as of the effective date of the report. At most such a sale would only be evidence of the value of such assets. The statute provides that, "The court may, on motion, allow supplemental pleadings, showing facts which occurred after the former pleadings were filed." § 2-1072, Burns' 1933, § 176, Baldwin's 1934. The statute makes permission to file such pleadings discretionary with the court, when such pleadings include facts which occurred after the filing of the original pleadings and which would be pertinent to the issues raised by the original pleadings. The supplemental exceptions tendered by the appellant failed to show such facts. The court did not abuse its discretion by refusing to permit the filing of the supplemental exceptions.

The exceptions filed to the 1937 report by the appel-

lant, on February 16, 1939, made the following principal objections to said report:

1. That the reinsurance contract by its terms requires that any adjustment of the lien be made not later than April 1st of each year on the basis of the facts shown by the annual report covering the preceding year; that the 1937 report was not filed until January 5, 1939, and attempted to increase the lien 35% on the policies in force December 24, 1938.

2. That while the amount of the aggregate lien was reduced in the year 1937 this reduction was not reflected in a decrease of the lien upon Northern States policies, which were unrewritten; that the Lincoln has, in violation of paragraph 15 of the reinsurance contract, and fraudulently, attempted to rewrite most of the Northern States policies and has rewritten thousands of said policies; that by reason of the delay in making and filing the 1937 report and by reason of its fraud and breach of said contract the Lincoln is estopped to assert and obtain an increase of lien for the year 1937 and should: (a) be required to assume any loss on the Northern States business for that year; (b) forfeit its rights to be paid for administration expenses incurred in handling policies rewritten by the Lincoln amounting to approximately $15,000.00; and (c) be required to return to the Northern States' fund $11,755.33 disbursed for renewal commissions on the rewriting of Northern States policies.

3. That the Lincoln in its 1937 report does not correctly account for interest pursuant to the reinsurance contract as amended in June, 1938.

4. That the Lincoln did not, in its 1937 report, account for a surplus of $20,421.32 shown by its 1936 report.

5. That the 1937 report contained no accounting for

profits and losses but attempted to charge out as losses current items of unpaid expenses, such as accrued death losses and estimated taxes, in violation of paragraph 4 of the reinsurance contract.

The exceptions concluded with a prayer that the Lincoln be required to modify the 1937 report so as to give full credit to Northern States policyholders according to their just rights as of December, 1937; that the Lincoln be required to assume all losses, if any, for the year 1937, and be enjoined from ever increasing the lien by reason of the operations for the year 1937; that it be required during the period of said reinsurance contract to account for interest upon assets accepted at agreed upon values and assets from income, at the rate of $\frac{1}{2}$ of 1% above the average earnings on all Lincoln assets including its policy loans; that the Lincoln be deprived of all compensation for administration during the year 1937, and be required to restore to the Northern States all disbursements made on that account; and that the Lincoln be required to restore to said Northern States fund all other sums due it as of December 31, 1937; and for all further proper equitable relief.

The special findings of fact recited the appointment of Morthland as receiver for the Northern States and the execution of the reinsurance contract and then set out the following paragraphs of said contract:

"4. Since the assets of the Northern States are insufficient at their present value to provide for the discharge of policy obligations of said Northern States assumed by the Lincoln, as part of the consideration for this reinsurance there shall be established and placed against each policy of the Northern States as of the effective date of this agreement, a lien equal to sixty per cent (60%) of the net equity of each policyholder as defined herein. The reserve on the business reinsured hereunder

shall be reduced by the sum of such lien and interest thereon. The term 'Net Equity' as used herein as applied to any policy is hereby defined as the mean reserve on such policy including paid-up additions as of December 12, 1932, less the sum of any policy indebtedness and accrued interest thereon on such date according to the basis of valuation required by the particular policy. Said lien is based upon an approximate and provisional valuation of the assets of the Northern States and will be subject to increase or decrease as may be required from time to time upon revaluation of the assets and upon profits or losses arising out of the business of the Northern States. The first adjustment of said lien shall be made not later than April 1, 1934, and subsequent adjustments shall be made annually thereafter provided the valuation of all Northern States assets at the end of the previous calendar year indicates that a change of five percent (5%) or more may be made in the lien. Such adjustments shall affect only business in force on said adjustment dates and shall become effective on such dates except as herein otherwise provided.

"13. For administration expenses incurred in handling the policies of the Northern States the Lincoln shall receive $2.25 per thousand per annum; provided, however, that the charge per thousand for extended insurance shall be $1.25 per thousand per annum; provided, further, that during the remainder of the calendar year 1933 the above charges shall be reduced to $2.00 per thousand and $1.00 per thousand respectively. Such expense charge shall accrue as of December 31st., 1932, and shall be based upon the amount of insurance in force on that date and on the 31st day of December of each year thereafter and shall be paid to the Lincoln quarterly.

"14. All policies lapsed since the date of receivership will be reinstated upon payment of premiums in arrears without evidence of insurability provided such premiums are paid within sixty days of the mailing date of notice of right of reinstatement to such lapsed policyholders; all other lapsed policies will be reinstated in accordance with the terms of the policies. All policies which may be reinstated shall be subject to the lien effective at

date of reinstatement, but payments made in connection with such reinstatements shall not be subject to lien.

"15. The Lincoln will offer no inducement to Northern States policyholders for changing their policies to policies in the Lincoln; however, policies having an equity available to the policyholder after deduction of the lien and interest thereon and any policy indebtedness which are rewritten in the Lincoln shall be continued as Northern States policies in determining the profits or losses on business of the Northern States, but in such cases the Lincoln shall have the right to pay renewal commissions out of the premiums received thereon to the agents who rewrite such policies.

"16. All assets of the Northern States, accepted by the Lincoln at agreed upon value, and assets from income, shall be credited with interest at the rate of one-half of one per cent per annum in excess of the average net rate of interest earned by the Lincoln on all its assets, as shown in the Gain and Loss Exhibit of the Lincoln for the previous calendar year. Such interest shall be credited at the end of each calendar year and shall be based upon the mean amount of such assets held during each month of such year, and shall continue as long as a lien exists but not more than fifteen (15) years from the date of this agreement.

"17. Assets which the Lincoln accumulates from income received from Northern States policyholders, and assets accepted by the Lincoln upon an agreed valuation to the extent of the value agreed upon, are guaranteed by the Lincoln as to principal. Not later than ten years from the date hereof, the Lincoln shall accept at values agreed upon between the Lincoln and the Trustee, for the benefit of the policyholders of the Northern States, all assets which were initially trusteed. At the expiration of said ten-year period and prior thereto, if said assets have theretofore been accepted by the Lincoln, the business shall be and become the sole property of the Lincoln except as to profits which accrue to policyholders of the Northern States as provided hereunder.

If at any time before the expiration of said ten-year period the amount accumulated to the credit

of Northern States Policyholders, including the agreed upon values of assets in the hands of Trustee, are sufficient to fully discharge the lien, the lien shall be thereupon discharged and the Lincoln shall accept the assets remaining in the hands of the Trustee and thereafter all profits shall accrue to and belong to the Lincoln.

"23. The Lincoln shall render an accounting of all transactions pertaining to the assets and business of the Northern States as soon as practicable after the end of each calendar year as long as a lien exists against Northern States policies, but not exceeding fifteen years. Such accounting shall be in the form of a Convention Annual Statement and shall be furnished to the Court, the Trustee and the Commissioners, and when approved by the Commissioner of Indiana shall be conclusive and binding on policyholders."

The special findings also disclosed the following pertinent facts: The reinsurance contract as amended in June, 1938, is now in full force and effect. Beginning with the year 1934, the Lincoln filed its annual reports with the court and each of said reports, including the report for 1937, was submitted to and approved by the Insurance Commissioner of Indiana. All of the reports, to and including the 1936 report, were also approved by the court.

Immediately following the execution of the reinsurance contract the Lincoln circularized all Northern States policyholders by letter correctly informing such policyholders of their rights and enclosed in each such letter a copy of the reinsurance contract and a certificate of assumption of the policyholder's policy.

During the month of April, 1937, the Lincoln filed its 1936 annual report which had been approved by the Indiana Insurance Commissioner and which showed that losses had been incurred which effected a lien increase of 15%. On April 30, 1937, the court entered

an order approving said report and said lien increase and providing that it apply as of December 31, 1936, to all Northern States policies in force April 1, 1937. A notice was then sent to all Northern States policyholders by the Lincoln, informing them of this lien increase and again correctly informing them of their rights. On October 20, 1937, on the petition of the said Grace M. Donnell, filed on behalf of herself and all other such policyholders, the court entered an order reducing the lien increase from 15% to 12% and providing that interest to be credited to the Northern States trust on all policy loans upon policies constituting Northern States Life Insurance Company business should from the effective date of the reinsurance contract until the further order of the court, be computed and accounted for at the rate of five and one-quarter (5¼) per cent per annum. Thereafter, in 1938, the Lincoln, because of a dispute with the appellant concerning the valuation of Northern States assets to be used in the 1937 report, filed a petition to amend the reinsurance contract by providing: (a) that in the event of a dispute between the Lincoln and the trustee concerning the valuation of said assets a third party should participate in determining such valuations and that the valuation of any two of the three should be binding; and (b) that the 5¼% per annum interest rate on the Northern States policy loans be made a permanent contractual requirement.

Thereafter, on March 14, 1938, the said Grace M. Donnell again appeared for herself and all other policyholders and filed a petition alleging that there had never been a judicial valuation of the Northern States assets; that such a valuation would show a large increase in value over the original figures; that there should be such a valuation; that the Lincoln then was,

and had been continuously, engaged in rewriting Northern States policies, inducing such policyholders to rewrite by misrepresentations concerning the effect of the lien and the value of the policies; that the Lincoln should account to the Northern States fund for the margin of $\frac{3}{4}$ of 1% in the interest "on what had been Northern States policy loans," that the Lincoln had been charging, as costs of administration, renewal commissions on rewriting Northern States policies which commissions, during 1937, amounted to approximately $11,000; that where such rewriting had been as a result of offering inducements to the holders of policies so rewritten, contrary to the terms of the reinsurance contract, the commission should be charged back against the Lincoln and that the activities of the Lincoln in rewriting were inequitable and unconscionable and it should be required to desist from rewriting.

The trustee appeared to both of these petitions. On June 7, 1938, the court entered an order that in compromise of the matters in issue on said petitions, the reinsurance contract should be amended to provide: (a) that the $5\frac{1}{4}$% interest rate on what had been Northern States policy loans should be made permanent during the life of the contract; (b) that in instances where the trustee and the Lincoln could not agree upon valuations, one Paul Kelly was appointed to act as a third party and the valuations fixed by a majority should control; and that with respect to valuations and reports theretofore filed with the court the same should stand and remain approved. The reinsurance contract was so amended.

During the period from November, 1937, to December, 1938, the Lincoln and the trustee were not in agreement on the valuations which should be used for the purpose of making up the 1937 report—the Lincoln

insisting that such valuations be reduced from the figure used in the 1936 report.

On March 22, 1938, the Lincoln filed its verified petition alleging the existence of the dispute; that there had been a loss in 1937 on Northern States business sufficient to change the lien 5% or more; that until valuations were arrived at its 1937 report could not be completed; and asking that the time for filing such report and with respect to any lien increase be extended. The court entered an order granting such petition and, subsequently, granted additional requests for extensions of time, the final extension being to February 20, 1939.

After his appointment as an appraiser in June, 1938, the said Kelly proceeded to familiarize himself with the property of said Northern States; had many meetings with the appellant and appellee, and finally, by agreement between him and the Lincoln and the trustee, new valuations were, on December 27, 1938, fixed substantially below the figure at which they had been carried in the 1936 report.

This decrease in valuations, together with the net operating loss on Northern States business during 1937, increased the deficit of the Northern States assets in the total sum of $264,420.03, which amount was incorporated in the 1937 report as the lien increase, was then assessed against the equity of the outstanding Northern States policies subject to the lien, and resulted in a 35% lien increase as of December 31, 1937, on policies in force December 24, 1938.

While said report was actually completed as to insurance operations early in 1938, it could not be put in final form until the values of the assets were so agreed upon.

The Indiana Insurance Commissioner in the spring

of 1938 had, through his examiners, completely checked and audited the Lincoln's Northern States department as to 1937 and then made an additional check and audit of all parts of the report except as to valuations in December, 1938, prior to the submission of the 1937 report. The Indiana Insurance Commissioner approved the report December 31, 1938, and on January 5, 1939, the Lincoln filed said report in court together with the commissioner's endorsement of approval thereon. Without waiting for the court's approval of said report, the Lincoln immediately put into effect the 35% lien increase and thereafter all surrenders, loans and rewrites were made on the basis of such increased lien.

During 1937 the Lincoln rewrote 1,900 Northern States policies in the total amount of $2,882,115.00, and in 1938 rewrote 755 such policies amounting to a total of $1,098,092.00. The rewriting of such policies by the Lincoln during 1937 resulted in a gain to the Northern States fund in the sum of $12,644.00.

In such rewriting there were no fraudulent representations or concealments nor any inducement offered by the Lincoln to the Northern States policyholders. In the rewriting of such policies upon which there were loans the policyholder was permitted to rewrite with the loan unpaid if he so chose. The Lincoln, when rewriting, never urged or recommended that any such policy loan be paid in whole or in part.

The aggregate deficiency, or lien, on December 31, 1936, was greater than the aggregate lien on December 31, 1937. However, policy terminations through death, lapse, surrender and rewrites, were sufficient to make necessary a 35% lien increase against the policies remaining in force on December 24, 1938. If there had been no rewriting during the period from April 1, 1938, through December 24, 1938, when the report was finally

completed, the necessary lien increase would have been not less than 31.6%.

Pursuant to the court's order of October 20, 1937, concerning the interest to be credited to the Northern States fund on loans on Northern States policies, the Lincoln, in an amended report for 1936, credited the Northern States fund with $37,389.31. In computing its own earnings for the purpose of determining the basis for calculating the correct rate of interest to be credited on Northern States ledger assets other than policy loans, Lincoln proceeded upon the theory that, since it was to pay a fixed rate of interest on Northern States policy loans, it should not include the income on its own policy loans in its earnings. The appellant insisted that this method did not give the correct basis for computing such interest rate. On September 13, 1938, the Lincoln complied with the contention of the trustee by crediting to the Northern States fund the sum of $4,062.12, being the amount by which the accounting method contended for by the trustee would have increased the income to the Northern States fund up to September 13, 1938. On November 15, 1938, Lincoln credited the Northern States fund with additional interest of $3,283.07, which was computed by compounding the interest on the item of $4,062.12 according to the time, from 1935 to 1937, when the different portions of this item accrued. The crediting of these two items as 1938 items was approved by the Indiana Insurance Commission and were made by the Lincoln in compliance with the demands of the trustee. Although the trustee was promptly notified of these credits being given he made no objection thereto until the exceptions were filed. If they had been credited as 1935, 1936 and 1937 items they would have

decreased the 35% lien increase by not more than 48/100 of 1%.

Throughout the life of the reinsurance contract the Lincoln has credited interest on Northern States policy loans on the basis of the mean monthly principal balance thereof without regard to the actual receipt by it of the interest, and has treated such loans as assets taken over by it at their par value. This is shown in all its annual reports which were filed and approved by the court. Since October 20, 1937, the Lincoln has accounted for policy loan interest at a guaranteed return of 5¼% per annum on the mean monthly principal aggregate of Northern States policy loans. Under this method of accounting any interest that might from time to time be refunded by the Lincoln in rewriting policy loans, was not charged against the Northern States fund. The method of accounting so used by the Lincoln and required by the contract was the correct, standard and approved accounting practice. The amounts actually credited by the Lincoln on this basis, as shown by the 1937 report, were true and correct and resulted in $7,428.25 more being credited to the Northern States fund in 1937 as interest from policy loans than would have been credited if the Lincoln had credited said fund only with the interest actually collected, and on the dates actually received.

The first 1936 report filed by the Lincoln showed a surplus at the end of that year of $20,421.32, and a lien increase of 15%. The subsequent reduction of the lien increase for that year from 15% to 12% exhausted the surplus shown in the 1936 report and left no part of said surplus to be accounted for by the Lincoln. This was shown by the amended 1936 report.

The inclusion in the 1937 report of unpaid existing liabilities was according to the practice followed by the

Lincoln in each annual report theretofore filed. It is the standard, correct accounting practice required by the Indiana Insurance Commissioner and prescribed in the Convention Annual Statement forms which the Lincoln was required by the reinsurance contract to use for annual reports.

The 1937 report was on the form of a Convention Annual Statement. Certain parts thereof pertaining to capital stock, surplus and related matters and the sheet for a gain and loss exhibit were not filled in. In none of the annual statements filed by the Lincoln for the years prior to 1937, was such gain and loss exhibit filled in. The Insurance Commissioner of Indiana had advised the Lincoln that the gain and loss exhibit was not necessary on the report of the Northern States operation. The practice of not furnishing such an exhibit in no way resulted in a benefit or gain to the Lincoln or in a loss to the Northern States fund and the accuracy of the 1937 report is not affected by the absence of a gain and loss statement. The Lincoln never refused to furnish full and complete information to appellant as to all Northern States matters.

When the Lincoln rewrote a policy on which there was a loan, the interest on such loan from the last policy anniversary date to the time of the rewriting was refunded to the policyholder. The practice of so refunding interest back to the last policy anniversary date is identical to that followed in all other rewriting cases and is approved, standard life insurance practice. This practice was followed by the Lincoln in instances where its own policyholders changed their policies from one form or type to another. As shown above, interest so refunded was not charged against the Northern States. With knowledge of the fact that the completed 1937 report would probably show an increase of the

lien the Lincoln continued to rewrite Northern States policies during 1938 on the basis of the lien established by the 1936 report and this resulted in such rewritten policyholders withdrawing from the Northern States fund more than they were equitably entitled to.

On the facts so found the court stated its conclusions of law and entered a judgment thereon ratifying and confirming the report, denying and overruling the exceptions of the trustee and approving a lien increase of 35% as of December 31, 1937, on all Northern States policies in force December 24, 1938, as affected by the 1937 annual report.

The appellant attacked certain of the special findings on the ground that they were not sustained by sufficient evidence and were contrary to law. On the issues formed the Lincoln had the burden of proving the correctness of its report as to matters contained in the report and questioned by the exceptions, but as to affirmative matters alleged in the exceptions to the report, such as rewriting by the Lincoln in violation of the insurance contract, the burden was upon the appellant. 24 C. J. 1018.

It has been considered that the trustee filing such a report is in the position of a plaintiff and the one filing exceptions thereto is in the position of a defendant. However, even a defendant who alleges new matter in avoidance of the plaintiff's action has the burden of establishing such new matter. 20 Am. Jur. 142, § 137.

In the portion of his brief entitled "Argument" the appellant questions the fact that it was not found in the special findings of fact that the Lincoln in its 1937 report fully and accurately accounted and that said account was correct. By its exceptions the appellant questioned only specific items of the 1937 report and certain methods followed by the Lin-

coln. The only issues thus presented were as to the correctness of those specific items and methods. Findings on items and methods not questioned by the exceptions were not necessary. In *Hamlyn et ux.* v. *Nesbit, Adm'r.* (1871), 37 Ind. 284, 291, in discussing the question of the burden of proof on the trial of the issues presented by exceptions to the report of an administrator, it was said:

"A majority of the court are of the opinion, that in the case under consideration, the administrators were required to establish the correctness of their report, *in respect to such matters as were embraced in the exceptions filed by the appellants,* and that this placed the burden of the proof on them, and gave them the right to begin and conclude the evidence, and to open and close the argument." (Our italics.)

This language was quoted and approved in *Taylor* v. *Burk, Executor* (1883), 91 Ind. 252, 255. See also *Wysong, Executor, etc.* v. *Nealis, et al.* (1895), 13 Ind. App. 165, 169, 41 N. E. 388.

The appellant contends that special findings numbered 15, 16 and 17 were contrary to the evidence because the two credits made by the Lincoln for interest in September and October, 1938, should have been shown in the 1937 report. These two credits of $4,062.12 and $3,283.07 were shown by the testimony of Mr. Stagg, the actuary of the Lincoln, to have been made pursuant to a demand by the appellant, and to have been allowed as a matter of compromise after a discussion of the method of accounting with the appellant. The demand and the discussions did not occur until in September, 1938.

Mr. Stagg also testified that the appellant made no contention at the time of the compromise that these credits should be dated back and thrown into the 1937

report. On reporting to a representative of the State insurance department that these credits were entered as 1938 items the representative of the State insurance department gave Mr. Stagg the opinion that this procedure was proper and correct. The reinsurance contract expressly provided that accounting for the determination of profits should be subject to the approval of the Commissioner of Insurance. At the time the credits were so allowed, the 1937 report, as to 1937 operations, had been completed and had been audited by the State insurance department. We find nothing in these three findings as to said two items of credit which could not have been reasonably inferred by the trial court from the evidence.

The appellant also contends that that portion of special finding of fact No. 15 which recited that the court order of October 20, 1937, "provided that until the further order of the court the Lincoln should give a flat 5¼% return on the principal amount of the Northern States policy loans" did not constitute a finding of fact but was a conclusion of law and involved a misconstruction of said judgment. Considering finding No. 15 as a whole, it was a finding of fact supported by the evidence.

Paragraph 16 of the reinsurance contract provided the method for crediting interest by the Lincoln on Northern States assets accepted by the Lincoln at agreed values. In all reports prior to 1937 the Lincoln had shown Northern States policy loans as such accepted assets and credited interest thereon accordingly. The reinsurance contract did not provide any particular method to be followed in agreeing upon values and accepting assets at such values. In relation thereto paragraph 28 of the reinsurance contract provided as follows:

"Assets accepted by the Lincoln at agreed upon values as distinguished from assets the equitable title to which is in the Trustee, are to be credited to Northern States policyholders at fixed values and thereafter the Lincoln shall only account for the income therefrom in accordance with Paragraph 16 of this agreement. By 'agreed on values' or 'agreed on valuations' as used herein is meant those values on assets which are acceptable to the Lincoln, the court and the Trustee and when such values are established and accepted the title to such assets shall absolutely vest in the Lincoln free from all claims of the Trustee."

The evidence shows that the Northern States policy loans were accepted by the Lincoln at their par value at the time the Lincoln took over the Northern States and from that time on were treated by the Lincoln as ledger assets. That this value was acceptable to the court and the trustee is shown by the fact that all reports prior to the 1937 report so treated the policy loans and such reports were all accepted and approved by both the trustee and the court. The appellant insists that such assets could not be accepted by the Lincoln as ledger assets without the written consent of the trustee and of the court and bases this contention upon the following provision from paragraph 22 of the reinsurance contract:

"The Lincoln shall not have power or authority to sell, exchange or otherwise alienate or dispose of any of said assets, nor divest the Trustee of said equitable interest, except upon written consent and approval of the Trustee and the said Court during the administration period but no necessity shall exist for recording said consent and same shall only be filed with the Lincoln."

The language immediately preceding this provision shows clearly that the "said assets" the disposal of which required the written consent of the trustee and

the court were the assets which were transferred to the Lincoln for administration purposes, the trusteed assets. The trusteed assets were those assets on which there might be a disagreement as to values and which the Lincoln was agreeing to take as trustee and try to work out. The Lincoln at once accepted the policy loans at their face value.

By its judgment of October 20, 1937, and by the amendment of the reinsurance contract pursuant to the judgment of June 7, 1938, the only change made as to Northern States policy loans was as to the rate of interest thereon. These assets were not changed from ledger assets to trusteed assets nor was the method of computing interest thereon changed. The interest to be credited on such assets was to be a "flat" rate, not dependent on the interest actually earned by or collected on these policy loans.

The appellant also objects to special findings numbered 6 and 7 because they are in conflict with his contention that the Northern States policy loans were not ledger assets.

The appellant contends that the facts found in special findings numbered 23, 24 and 25 and facts proved by uncontradicted evidence are all in irreconcilable conflict with that part of special finding No. 11 which stated that in rewriting Northern States policies the Lincoln did not offer any inducement in connection therewith. Paragraph 15 of the reinsurance contract provided that the Lincoln should not offer any inducement to Northern States policyholders for changing their policies to policies in the Lincoln, but also provided that policies having an equity available to the policyholder which were rewritten in the Lincoln should after rewriting be considered Northern States policies in determining the profits or losses on business of the

Northern States, and that in such cases of rewriting the Lincoln should have the right to pay renewal commissions out of the premiums received thereon to the agent who rewrote such policy. This provision of the reinsurance contract clearly contemplated that there would be some Northern States policies rewritten by the Lincoln, and nothing in this provision prohibits such rewriting. It was, of course, contemplated that in such rewriting the Lincoln, in consideration of the transfer to it of the equity in the old policy, would issue to the policyholder a new Lincoln policy. Issuing the new Lincoln policy would be an inducement within the broad dictionary definition of the word but no one would contend that issuing the new policy constituted a breach of this provision of the contract. The fair construction of this provision of the contract is that it only prohibited the Lincoln from offering the Northern States policyholders inducements other than the ordinary considerations regularly given to rewriting policyholders. It must have been contemplated that in such rewriting the Lincoln would follow the ordinary course of business in rewriting and would give the policyholder the ordinary considerations that are usually given to a policyholder in such a case. The contacting of the Northern States policyholders by the Lincoln, and correctly instructing them as to their rights and as to the operation of the lien on their policies, as described in special finding No. 23 did not constitute offering inducements within the meaning of paragraph 15 of the reinsurance contract. Special finding No. 24 states that on policies rewritten the policy loan interest from the last policy anniversary date to the time of the rewriting was refunded to the policyholder. It also found that such refunding was the practice followed in all other

rewriting cases and followed by the Lincoln in instances where its own policyholders changed their policies from one form to another; that it was an ordinary consideration given in cases of rewriting. The facts found by finding No. 24 did not show the Lincoln offering any "inducement to Northern States policyholders" within the meaning of the reinsurance contract. Nor does special finding No. 25, which described the rewriting done by the Lincoln after it knew an increase in the lien would be necessary but before the increase was made, contradict special finding No. 11 by showing any inducement offered to the policyholders of the Northern States within the meaning of the reinsurance contract. The reinsurance contract permitted withdrawals and rewriting. If the policyholder withdrew or rewrote at a time when losses in operations or values had increased the deficiency but before the lien had been increased to meet such deficiency he would withdraw more than his equitable share of the assets. This was permissible under their contract.

The appellant insists that the violation of this provision of the contract was established by the uncontradicted evidence showing the employment by the Lincoln of agents to procure such rewriting and that the amount of the compensation of such agents was made to depend upon the amount of rewriting done by them. That the reinsurance contract contemplated the payment of agents on a commission basis is shown by the provision that such commissions should be paid from the premiums received on such rewritten policies. Payment of a commission to the agent could not constitute an inducement to the policyholder.

The appellant also contends that by dating the rewritten policies back and thus giving the rewritten

policyholder the advantage of such age reduction, the extent of such dating back depending upon the unliened reserve value of the policy in question, constituted giving such policyholder an inducement contrary to the reinsurance contract. It was shown, however, that this also was the ordinary practice in rewriting policies and an ordinary consideration for the money paid by the policyholder. If the policy had not been so dated back, it would have been made more advantageous to the policyholder in some other particular. The Lincoln was simply giving the policyholder the ordinary consideration for the amount of his equity in his Northern States policy. The policyholder could have withdrawn the cash value of the Northern States policy and have purchased from the Lincoln or any other insurance company such a policy as he received by the rewriting. If he had purchased the new policy from a company other than Lincoln, future profits on such policy would not have accrued to the Northern States fund. This practice was not the "offering of an inducement."

The appellant also insists that the Lincoln by rewriting permitted the holders of rewritten policies to escape all losses subsequent to the last lien adjustment date and thereby induced them to rewrite in the Lincoln contrary to the provisions of the reinsurance contract. Policyholders who had withdrawn their cash value or rewritten their policies could not be reached by any subsequent change in the lien. Since withdrawing and rewriting was permitted by the contract, the legal result of such rewriting could not be considered as an inducement offered in violation of the contract.

The appellant objects to finding of fact No. 20 as not being sustained by the evidence and being contrary to

law, contending that liabilities incurred in 1937 but legally payable in 1938 should not be considered losses in the year 1937 so as to form a basis for a lien increase as of December 31, 1937. Special finding of fact No. 20 did not consider such items as being losses in 1937, but properly found that they, constituted liabilities; that standard, correct insurance accounting required them to be shown as liabilities in the 1937 report; and that such accounting was required by the Indiana Insurance Commission and prescribed in the Convention Annual Statement forms on which the reinsurance contract provided that the annual report should be made.

In order to determine the correct amount of the lien on Northern States policies as of any certain date by a report as of that date, it was necessary to include in such report all liabilities as of that date.

The appellant contends that under the provisions of paragraph 4 of the reinsurance contract, the lien could not be increased without a revaluation of the assets and an accounting for profits and losses and that the 1937 report contained no such account. He bases this contention on the following sentence of said contract: "Said lien is based upon an approximate and provisional valuation of the assets of the Northern States and will be subject to increase or decrease as may be required from time to time upon revaluation of the assets and upon profits or losses arising out of the business of the Northern States." A consideration of all the other provisions of the contract and the purpose of the lien discloses the fact that the amount of the lien depended only on the amount of the deficiency of the assets and that profits and losses could affect the lien only to the extent that the net profits or losses affected the amount of the deficiency in the assets.

The language relied on by the appellant did not require a separate accounting for profits and losses, but only such an account as would accurately reveal the amount of the deficiency of the assets in the Northern States fund. This the 1937 report did.

By the reinsurance contract the Lincoln agreed to reinsure the policyholders of the Northern States subject to the conditions and limitations imposed by the reinsurance contract. In consideration of so reinsuring these policyholders the deposited assets of the Northern States were transferred to the Lincoln. At that time the Northern States was insolvent. It did not have sufficient assets to meet the liabilities on its outstanding policies. The required reserve on these policies had been depleted. Each policyholder was then entitled only to his pro rata share of such depleted reserves. No solvent insurance company could undertake to reinsure these policyholders, in the amount and according to the terms of their policies, in consideration of receiving assets which did not equal the reserve liabilities on these policies. In order to meet this situation the reinsurance contract provided that each Northern States policy should be considered as having a lien or indebtedness against it equal to its proportionate share of the deficiency between the Northern States assets and the total liabilities of the Northern States on policy reserves. This lien was to be considered as a debt against the policy in case of a withdrawal, making a policy loan or termination of the policy. As against death claims the lien was waived.

If the operation of the Northern States business by the Lincoln resulted in net profits or if the values of the assets in the Northern States fund increased, the deficiency between the assets and the liabilities on policy reserves would necessarily decrease, and if the policies

subject to the lien remained the same, the lien or indebtedness on each policy should likewise be decreased. If, on the other hand, net losses resulted from the operation of the Northern States business and values of the assets decreased, an enlarged deficiency would result making necessary an increased lien on each policy, if the policies in force remained the same, and a greater increase if there had been terminations of policies resulting from any cause. To protect the Lincoln against an increased deficiency and to give the Northern States policyholders the advantage of any decrease in the deficiency, it was provided that the amount of the deficiency in assets and the corresponding increase or decrease in lien should be determined annually pursuant to the provisions of the reinsurance contract. In determining the amount of the assets available for meeting the required reserves on outstanding policies, it was also necessary to consider all other liabilities payable out of such assets. That portion of the assets which was to be used for the payment of liabilities other than policy reserve liabilities could not be considered as available for the payment of liabilities on the policy reserve. It was, therefore, proper and necessary in the 1937 report, made for the purpose of determining the lien for the ensuing year, to report and consider all liabilities which had accrued and were payable out of the Northern States fund, even though such liabilities had not been paid. See *Stevens* v. *Central Life Assur. Soc.* (1939), 101 F. (2d) 383; *Rheinberger* v. *Security Life Ins. Co. Of America* (1933), 4 Fed. Supp. 824; *Protective Life Ins. Co.* v. *Tibbs* (1936), 192 Ark. 356, 91 S. W. (2d) 593.

The appellant objects that there were no findings on his exceptions Nos. 5 and 7, in which exceptions he

objected to the inclusion of the amount of disbursements for renewal commissions, and asserted that the Lincoln was estopped to assert an increase of lien for the year 1937. Both exceptions were based on the contention that the Lincoln had violated paragraph 15 of the reinsurance contract in rewriting. Since the court properly found that the Lincoln did not violate the reinsurance contract in rewriting no other findings on these exceptions were necessary.

Appellant insists that exception No. 9, to the effect that the $20,000.00 surplus shown by the 1936 report was not accounted for in the 1937 report, was established by the evidence. Instead the evidence showed that this surplus, resulting from an increased lien of 15% reported in the 1936 report, was wiped out by the reduction of the increase to 12% leaving no surplus to be accounted for by the Lincoln, and the court so found.

The appellant also assigned as error each of the conclusions of law.

The appellant bases his seventh assignment of error on conclusion of law No. 1 which stated that the reinsurance contract was a valid written contract and that the liabilities and duties of the Lincoln were those expressed therein. Under his propositions on this assignment the appellant refers to the judgments of October 20, 1937, and of June 7, 1938, which were set out in the findings of fact, as being contrary to this conclusion of law. These two judgments, however, simply interpreted and ordered amended the reinsurance contract and it was this contract, so interpreted and amended, to which the court referred in this conclusion.

The appellant contends as to the first four conclusions of law that each is actually a finding of fact and not a conclusion of law. If this contention be correct we may

treat these four conclusions as mere surplusage because they are not necessary to support the judgment. The appellant admits that the fifth conclusion of law is sufficient in form to support the judgment.

The second conclusion of law stated that the Lincoln was not estopped from effecting any lien increase by reason of the delay in filing its 1937 report or for any other reason. This conclusion was supported by the special findings of fact. Special finding of fact No. 8 showed that the delay in filing the 1937 report was caused by the disagreement on the valuation of the assets to be included in said report and that the court expressly granted the appellee permission to delay the filing of the report because of such disagreement. A delay which was not caused by the Lincoln and which was permitted by the order of the court, could not estop the Lincoln from effecting a lien increase if the report showed such increase to be necessary. Nor did the facts found in any of the other special findings furnish any basis for such estoppel.

The third conclusion of law stated that the Lincoln in rewriting had not violated the applicable provisions of the reinsurance contract. The appellant insists that this conclusion of law is contrary to special findings Nos. 23, 24 and 25. As heretofore pointed out none of the facts shown in these special findings amounted to the offering or giving of inducements within the meaning of paragraph 15 of the reinsurance contract.

The fourth conclusion of law stated that the Lincoln has fully and accurately accounted in its 1937 report and that said account was correct. Under the propositions addressed to this assignment of error the appellant states that this conclusion did not follow the facts as found in the special findings of fact and is contrary to certain of the special findings, but fails to point out

any particular in which this conclusion fails to follow or contradicts said findings.

Conclusion of law No. 5 states that on all issues the law is with the Lincoln National Life Insurance Company. This conclusion of law is sufficient to support the judgment if it is supported by the facts found. *State ex rel. Johnson, et al.* v. *Boyd,* v. *Viets,* v. *Krack* (1940), 217 Ind. 348, 28 N. E. (2d) 256. It is aided, however, by conclusion of law No. 6 stating that the 1937 report should be in all things ratified, confirmed and approved and by conclusion of law No. 7 stating that each of the exceptions of the trustee to said report should be denied and overruled. As to these conclusions the appellant also insists that neither of them is supported by the special findings and that each of them is contrary to certain of the special findings of fact. All questions raised by the appellant under these propositions, however, have been hereinbefore discussed and determined contrary to the appellant's contentions.

Conclusion of law No. 8 stated that a lien increase of 35% was effected as of December 31, 1937, on all Northern States policies in force December 24, 1938. The appellant contends that this conclusion is erroneous because it is against the law of this case, in that said conclusion attempted to make the lien retroactive to December 31, 1937, contrary to the decision of this court in *Morthland, Trustee* v. *Lincoln Nat. Life Ins. Co.* (1940), 216 Ind. 689, 25 N. E. (2d) 325. In that case we held that the reports filed by the Lincoln with the Insurance Commission and the court must be approved by the court in order to be conclusive and binding. We did not there decide when an increase of lien, shown to be necessary by the facts revealed by such an annual report, should become effective. This

conclusion of law is therefore not against the law of this case.

The appellant also contends that the increase of the lien is the taking of property and that, therefore, the judgment cannot be retroactive. The property was not taken by the judgment. The 1937 report showed the additional lien necessary in order to meet the increased deficiency in assets. It was the decrease in valuations and operating losses which had deprived the policyholders of their property. The judgment was a final determination that the report accurately disclosed a condition which, under the terms of the reinsurance contract, effected an increase of the lien. The parties acting on the basis of such increased lien prior to the approval of the report by the court do so at the risk of the court failing to approve the report. In the instant case if the Lincoln, after having determined the amount of the increase of the lien and after having secured the approval of the Insurance Commissioner of the computation, had continued to permit withdrawals and rewriting on the basis of the old lien until the court approved the 1937 report, they would have thereby permitted such withdrawing and rewriting policyholders to withdraw more than their equitable or legal share of the Northern States assets. One of the most serious contentions made by the appellant in this case is that the Lincoln by rewriting Northern States policies during 1938 on the basis of the old lien permitted such rewriting policyholders to withdraw more than their share of the Northern States assets and thereby made necessary a greater increase in the lien on the policies in force on December 24, 1938, than would have been necessary if no rewriting had been done during 1938. The appellant seems to contend both that the lien could not legally be put into effect until

the report was approved by the court and also that policyholders should not have been permitted to withdraw and rewrite subsequent to December 31, 1937, on the basis of the old lien. If the policyholders had the right to withdraw or rewrite during 1938, the second contention of appellant must be based on the theory that the increased lien should have been put into effect January 1, 1938. It is easier to understand his first contention than the second. The trial court decided this case on the theory that the Lincoln was acting within the provisions of the reinsurance contract by continuing to do business with the Northern States policyholders on the basis of the old lien until the report showing the increased lien was completed and approved by the insurance commissioner of the State of Indiana. The appellant has failed to point out any convincing reason why this theory of the trial court was not correct.

The reinsurance contract provided that the lien would be subject to such increase or decrease as might be required from time to time by a change in the deficiency of the Northern States assets. It is provided that the first adjustment of the lien should be made not later than April 1, 1934, and that subsequent adjustments should be made annually thereafter, provided the facts warranted a change of 5% or more in the lien.

Paragraph 4 of the reinsurance contract expressly provided that "such adjustment shall affect only business in force on said adjustment dates and shall become effective on such dates except as herein otherwise provided." The reinsurance contract provided for a five-year moratorium on the payment of cash values and the making of policy loans on Northern States policies, thereby indicating that policyholders should be free after the expiration of the five-year moratorium to withdraw the cash value on their policies or

to make policy loans, restricted only by the provisions of the policy and the equity of the policyholder in the policy. As we have heretofore shown, paragraph 15 of the reinsurance contract recognized the right of the Northern States policyholders to change their Northern States policies to policies in the Lincoln. Such withdrawals and rewrites made prior to April 1st could not be on the basis of the new lien until a report of the preceding year had been completed and it had been determined what the new lien was to be. Considering the contract as a whole, we must assume that the above quoted provision of paragraph 4 of the said contract authorized the Lincoln during the period from December 31st of each year to April 1st of the ensuing year to grant Northern States policyholders the right to withdraw, to rewrite and to make policy loans on the basis of the lien in effect during the preceding year. It cannot be assumed that the contract required the Lincoln to hold the Northern States policies as frozen against withdrawals, loans and rewriting during these three months of each year. A consideration of the entire contract discloses that the only moratorium intended on withdrawals or the making of policy loans was during the first five years and that there was to be no moratorium on rewriting. All parties to the contract, contemplating such withdrawals and rewriting, must have realized that there could be no such withdrawal or rewriting without affecting the interest of the remaining policyholders unless at the particular time of the withdrawal or rewriting the deficiency in the Northern States assets happened to exactly equal the aggregate of the liens then in effect on all of the Northern States policies. They knew that the lien could not be so exactly adjusted at the time of each withdrawal or rewriting. They provided in the reinsurance

contract for the adjustment of the lien on April 1st of each year, realizing that withdrawals made between December 31st and April 1st of the ensuing year on the basis of the lien for the prior year might result in the withdrawing policyholder withdrawing more than he was equitably entitled to, and at the expense of the remaining policyholders. There is no difficulty in saying that the Lincoln acted within the contemplation of the makers of the reinsurance contract when it permitted withdrawals and rewriting up until April 1, 1938, on the basis of the lien established by the 1936 report. Nor do we believe that it was beyond the contemplation of the makers of the contract that, in the event the report was not filed and the amount of the lien was not determined, as was the case here, after the adjustment date fixed by the contract, the delay not being the fault of the Lincoln and the time for filing the report and adjusting the lien being extended by an order of the court, the Lincoln should continue to permit withdrawals and rewriting on the basis of the old lien until such time as the new or adjusted lien was determined. The lien as adjusted could affect only the policies in force on such postponed adjustment date. Use of the adjusted lien as a basis on which to do business with the Northern States policyholders prior to the determination of its amount would be impossible, and the failure to use it as a basis for such business after its determination would result in an unjustifiable loss to the remaining policyholders.

Appellant makes no contention that the Lincoln was not acting pursuant to the reinsurance contract in permitting Northern States policyholders to withdraw their cash equity during this period on the basis of the old lien. Yet such withdrawals resulted in greater losses to the remaining policyholders than the rewriting.

We conclude that the Lincoln was acting pursuant to the terms of the reinsurance contract in permitting withdrawals and rewriting during the period from January 1, 1938, to December 24, 1938, on the basis of the old lien, and that the adjusted lien should affect only policies in force on December 24, 1938, the postponed adjustment date. There was no error in the eighth conclusion of law.

We find no reversible error. The judgment is affirmed.

Roll, C. J., dissents.

NOTE.—Reported in 42 N. E. (2d) 41.

## ON PETITION FOR REHEARING.

PER CURIAM.—Rehearing denied.

O'Malley, J., not participating.

## DISSENTING OPINION ON PETITION FOR REHEARING.

FANSLER, J.—I believe the rehearing should be granted. The provision in the contract for an annual readjustment of the lien cannot be ignored. It must have been intended that the amount of the cash-surrender value of the policies should be changed annually to conform to the changed value of the assets. Permitting the cashing and rewriting of policies for an additional year when it was known that the value of the net assets had greatly decreased defeated this purpose and worked a substantial injury to the remaining policyholders. When the Lincoln rewrote policies on the basis of the old values it amounted to offering an inducement contrary to the terms of the contract. This is one of the reasons why Roll, J., dissented from the original opinion.

NOTE.—Reported in 46 N. E. (2d) 203.